E FILED ON 11/12/10
THOMAS E. CROWE, ESQ.
THOMAS E. CROWE PROFESSIONAL
LAW CORPORATION
tcrowelaw@yahoo.com
2830 S. Jones Blvd. #3
Las Vegas, Nevada 89146
(702) 794-0373
Attorney for Debtor-in-possession
Nevada State Bar no. 3048

### UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEVADA

| | | |
|---|---|---|
| In re: | ) | BANKRUPTCY NUMBER: |
| | ) | BK-S-10-23094-LBR |
| HECTOR ECHAGUE, | ) | Chapter 11 |
| | ) | |
| | ) | |
| Debtor. | ) | Date: 12/15/10 |
| | ) | Time: 2:00 p.m. |

DISCLOSURE STATEMENT

I.

**INTRODUCTION AND REPRESENTATION**

**A.  INTRODUCTION**

HECTOR ECHAGUE the Debtor in the above-entitled proceeding, provides this

Disclosure Statement to all of his known creditors and security holders pursuant to 11 U.S.C.

§1125. The purpose of this Disclosure Statement is to provide the information that may be

deemed material, important and necessary to the creditors and security holders of Debtor to make

a reasonably informed decision in exercising their right to vote for acceptance of the Plan of

Reorganization of the Debtor (hereinafter referred to as "The Plan"). The Disclosure Statement

will describe the Debtor, describe events that have occurred in the Bankruptcy case, explain the

1

Plan, how it works and how to vote for or against it.  The Plan was filed simultaneously with this Disclosure Statement in the United States Bankruptcy Court of the District of the State of Nevada.

### B.  REPRESENTATIONS

No representations concerning the Debtor or the Plan are authorized other than as set forth herein. Any representations or inducements to secure your acceptance of the Plan other than as contained herein should not be relied upon by you in arriving at a decision. The information contained herein has not been reviewed or passed upon by an accountant. The Debtor is unable to warrant or represent that the information contained herein is without any inaccuracy although all such information is accurate to the best of Debtor's knowledge, information and belief. The court has not verified the accuracy of the information contained herein, and the Court's approval of this Disclosure Statement does not imply that the Court endorses or approves the Plan, but only that the information is accurate and that, it is sufficient to provide an adequate basis for creditors and interest holders to make informed decisions whether to approve or reject the Plan. The information contained herein is provided as of the date of this Disclosure Statement unless clearly indicated to the contrary.

### II.

### GENERAL INFORMATION ON CHAPTER 11 REORGANIZATION PROCEEDINGS

Chapter 11 of the Bankruptcy Code is a remedial statute designed to effect the rehabilitation and reorganization of financially distressed individuals and entities.  The statutory aims of a reorganization proceeding include the following:

(a)  preservation of the Debtor's property as a going  concern and preservation of any going

2

concern value of the Debtor's business and operations;

    (b) avoidance of a forced and destructive liquidation of the Debtor's assets;

    (c) the protection of the interests of creditors, both secured and unsecured;

    (d) the restructuring of the debts of the Debtor and, the finances of the Debtor, such as would enable him to retain those assets necessary to rehabilitate his finances and (at the same time) produce the greatest recovery for his creditors.

The formulation and confirmation of a plan of reorganization is the principal function of a Chapter 11 case. Such a plan normally includes provisions for: (a) altering and modifying rights of creditors; (b) dealing with the property of the Debtor; (c) paying costs and expenses of administering the Chapter 11 case; and (d) execution of the plan. The plan may affect the interests of all parties and creditors, reject executory contracts, and provide for prosecution or settlement of claims belonging to the Debtor. In order to be confirmed by the Court, the Code requires that there be a finding that the plan receive the votes of certain requisite classes and that the plan be "fair, equitable, and feasible," as to any dissenting classes of creditors.

In order for a plan to be "fair and equitable," it must comply with the so-called absolute priority rule. The absolute priority rule requires that beginning with the most senior rank of claims of creditors against the Debtor, each class in descending rank or priority must receive full and complete compensation before inferior or junior classes may participate in the distribution. This rule, has, however been modified for individual debtors. See U.S.C. § 1129(b)(2)(B)(ii), allowing individual debtors to retain property of the estate under §1114. The plan must be accepted by the affirmative vote of a majority (in number of creditors and in amount) of claims filed and allowed by each class, unless adequate provisions are made for the classes of dissenting creditors. In order to

fully understand how a plan is confirmed, each individual creditor should review the Plan and Disclosure Statement with his or her own attorney and receive full advise on the inter-workings of Sections 507(a), 1111, 1122, 1123, 1124 and 1129 of the Code. **THE FOREGOING IS A BRIEF SUMMARY OF THE HIGHLIGHTS OF A PLAN AND CONFIRMATION OF SUCH, AND THIS FOREGOING SUMMARY SHOULD NOT SOLELY BE RELIED ON FOR VOTING PURPOSES. CREDITORS ARE URGED TO CONSULT WITH THEIR OWN COUNSEL BEFORE MAKING ANY DECISIONS ON A PLAN FILED HEREIN**.

In addition to the above, Section 1125 of the Code requires that there be a post-petition disclosure in the form of a disclosure statement which provides "adequate information" to creditors before anyone may solicit acceptances of a Chapter 11 plan. **THIS DISCLOSURE STATEMENT IS PREPARED IN ACCORDANCE WITH SECTION 1125 SO AS TO PROVIDE "ADEQUATE INFORMATION" TO THE CREDITORS IN THIS PROCEEDING. CREDITORS ARE URGED TO CONSULT WITH THEIR OWN INDIVIDUAL COUNSEL AND TO REVIEW ALL OF THE PLEADINGS FILED IN THIS BANKRUPTCY PROCEEDING IN ORDER TO FULLY UNDERSTAND THE DISCLOSURES MADE HEREIN, ANY PLAN OF REORGANIZATION FILED HEREIN, AND ANY OTHER PERTINENT MATTERS IN THIS PROCEEDING. ANY PLAN OF REORGANIZATION WILL BE COMPLEX, ESPECIALLY SINCE IT REPRESENTS A PROPOSED LEGALLY BINDING AGREEMENT BY DEBTOR (OR ANY OTHER PROPONENT OF A PLAN), AND ANY INTELLIGENT JUDGMENT CONCERNING ANY PROPOSED PLANS CANNOT BE MADE WITHOUT FULLY UNDERSTANDING THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND THE**

4

**FULL COMPLEXITIES OF ANY PLAN PROPOSED HEREIN**.

    The Debtor is suited for, and in dire need of, the broad protection afforded by Chapter 11.  The Debtor was in a distressed financial condition largely as a consequence of the dramatic downturn in the real estate market and concomitant loss of income.  <u>See</u> section IV below.  The Debtor has proposed a successful plan of reorganization in the form of the Plan submitted herewith, and plans to solicit approval and acceptance of it by the creditors, but only after there has been judicial approval of this disclosure statement, including any amendments hereto.

**III.**

**PREPARATION OF PLAN**

  The plan and the history of the Debtor has been prepared by the Debtor, together with the attorney for the Debtor, THOMAS E. CROWE, ESQ..

**IV.**

**BACKGROUND**

  Debtor has operated as real estate investor since 2000.  Debtor bought, financed, rented, improved and sold approximately ten properties over the previous ten years, generally at a profit. Debtor operates solely as an individual and sole proprietor. Debtor has no "insiders" as defined in 11 U.S.C § 101(31), either within creditor classes or otherwise.

  In approximately the latter part of 2007, the real estate market began a rapid deterioration. The properties of the Debtor declined in value and several renters also vacated, causing cash flow problems. Several of the properties fell into foreclosure. Debtor, believing, based upon his experience, that the market will recover, filed the instant Chapter 11 to prevent destructive

5

liquidation of the properties. His intent would be to satisfy all secured claims, as determined under 11 U.S.C. § 506(a), pursuant to payments of principal and interest over the original term of the respective mortgages, in a modified amount based upon current market interest rates. Further details of Debtor's Plan for payments are contained in the Motion for Use of Cash Collateral filed in this matter at Docket #52 and attached hereto as Exhibit A.

Debtor has made a decision that all of the properties are capable of providing sufficient cash flow to permit Debtor to retain those properties. The Plan thus proposes to retain all properties.

Aside from the secured claims, Debtor must also satisfy unsecured creditors through a five-year disposable income plan, under which his "projected disposable income," as defined in 11 U.S.C. §101 (10a), will be paid into the Plan, upon approval by the Court, to be divided pro rata among the unsecured claimants. See 11 U.S.C. §1129(a)(15). Debtor further is not planning, at least at this stage, any pursuit of avoidable transfers or objections to claims.

Debtor's post petition operations are clearly detailed on his Monthly Operating Reports which are current through September, 2010. Said reports indicate the Debtor's cash flow has been, adequate to make all required payments for the properties including principal and interest, taxes and insurance, property management, repairs, HOA fees, maintenance, etc. Debtor has sufficient net income per B22C and Schedules I and J to fund the proposed payments to unsecured creditors under the Plan.

## V.

## EMPLOYMENT PLAN

NONE

## VI.

## DESCRIPTION AND STATUS OF CHAPTER 11 PROCEEDINGS AND SUMMARY OF

## ASSETS AND LIABILITIES PRIOR TO FILING

Debtor's intention is that the following properties be retained and the secured claims satisfied in full, pursuant to the Plan of Reorganization:

- 2719 Boise Street, Las Vegas, Nevada 89121

- 2451 Palora Avenue, Las Vegas, Nevada 89121

- 1937 Cindysue Street, Las Vegas, Nevada 89106

- 3505 Thomas Avenue, Las Vegas, Nevada 89030

- 2212 Sunrise Avenue, Las Vegas, Nevada 89101

The statement of affairs and schedules of assets and liabilities of the Debtor has previously been filed herein and to the best of the knowledge, information and belief of the Debtor, these statements contain an accurate itemization of its assets and liabilities prior to filing.  Appraisals of the properties to be valued are attached as Exhibits B through E:

A summary of the value of the properties being retained, the rents and the required modified payments against each appears below:

7

**CREDITOR** U.S. Bank

**PROPERTY ADDRESS**: 2719 Boise Street, Las Vegas, Nevada 89121

**VALUE**:  $88,000.00

**MAXIMUM RENT**: N/A Residence

**P & I**:  $1,679.14

**TAXES/INSURANCE/MNGMNT  FEES**:  $96

**UTILITIES/REPAIRS/MAINTENANCE/HOA/ETC.**: $850.00

**CREDITOR** Wells Fargo

**PROPERTY ADDRESS**: 2451 Palora Avenue, Las Vegas, Nevada 89121

**VALUE**:  $83,500.00

**MAXIMUM RENT**: $1,100.00

**P & I**:  $423.08 (30 Years @ 4.5%)

**TAXES/INSURANCE/MNGMNT  FEES**:  $334.00

**UTILITIES/REPAIRS/MAINTENANCE/HOA/ETC.**: $110.00

**CREDITOR** Wells Fargo

**PROPERTY ADDRESS**: 1937 Cindysue Street, Las Vegas, Nevada 89106

**VALUE**:  $105,000.00

**MAXIMUM RENT**: $500.00

**P & I**:  $532.02 (30 Years @ 4.5%)

**TAXES/INSURANCE/MNGMNT  FEES**:  $390.00

**UTILITIES/REPAIRS/MAINTENANCE/HOA/ETC.**: $120.00

**CREDITOR** Wells Fargo

**PROPERTY ADDRESS**: 3505 Thomas Avenue, Las Vegas, Nevada 89030

**VALUE**:  $97,000.00

**MAXIMUM RENT**: $500.00

**P & I**:  $491.48 (30 Years @ 4.5%)

**TAXES/INSURANCE/MNGMNT  FEES**:  $152.00

**UTILITIES/REPAIRS/MAINTENANCE/HOA/ETC.**: $180.00

**CREDITOR** M & T Bank

**PROPERTY ADDRESS**: 2212 Sunrise Avenue, Las Vegas, Nevada 89101

**VALUE**:  $128,000.00

**MAXIMUM RENT**: $1,600.00

**P & I**:  $648.56 (30 Years @ 4.5%)

**TAXES/INSURANCE/MNGMNT  FEES**:  $183.00

**UTILITIES/REPAIRS/MAINTENANCE/HOA/ETC.**: $225.00

The Debtor's post-petition finances are, he feels, accurately reflected in the Monthly Operating Reports consistently filed by said Debtor since the date of the Petition.  See Monthly Operating Reports for July 2010 through September 2010 and attached hereto as Exhibits F through H. Said reports indicate the Debtor's cash flow has been, adequate to make all required payments for the properties including principal and interest, taxes and insurance, property management, repairs, HOA fees, maintenance, etc. In order to provide adequate protection for Secured Creditors, Debtor will commence payments of what he believes are adequate Principal and Interest payments sufficient in

amounts to satisfy the requirement of 11 U.S.C § 1329(b)(2)(A)(i)(II). Secured Creditors, under the Plan, shall retain their liens, to the extent of the allowed amount of their claims, until the full value of their claims have been paid. Debtor has sufficient net income per form B22C and Schedules I and J to also fund the proposed payments to unsecured creditors under the Plan.

## SUMMARY OF ACTIVITIES DURING PROCEEDINGS

On July 14, 2010, Debtor filed a Voluntary Petition. On July 27, 2010, Debtor filed an Application to Employ Thomas E. Crowe as Attorney for Debtor. On August 3, 2010, Debtor filed an Application to Employ Andrew N. Rana as Accountant for Debtor. On August 13, 2010, Debtor filed a Certification of completion of instructional course concerning personal financial management. On August 19, 2010, Debtor filed a Monthly Operation Report for period ending July 2010.

On September 9, 2010, Debtor filed a Status Report. On September 10, 2010, an order was entered granting the Application to Employ Thomas E. Crowe as Attorney for Debtor. On September 15, 2010, an order was entered granting the Application to Employ Andrew N. Rana as Accountant for Debtor. On September 17, 2010, Debtor filed a Monthly Operating Report for period ending August, 2010. On October 8, 2010, Debtor filed a Monthly Operating Report for period ending September, 2010. On October 25, 2010, Debtor filed a Motion to Extend Exclusivity Period. On October 26, 2010, Creditor U.S. Bank filed a Motion for relief from automatic stay regarding the property located 2719 Boise Street, Las Vegas, Nevada 89121.On November 3, 2010, Debtor filed a Motion for authorization to use cash collateral.

## PENDING LITIGATION

None.

## VII.

## PRESENT FINANCIAL CONDITION : ASSETS

The assets of the Debtor are more fully shown on schedules A and B of the schedules of assets and liabilities filed herein, as well as in post-petition operating reports. The properties are proposed to be retained subject to payment of the secured claims of the various creditors over no longer than 30 years, The non-real estate assets of the Debtor are of insignificant value to the estate. **TO THE BEST OF THE KNOWLEDGE, INFORMATION, AND BELIEF OF THE DEBTOR, THESE STATEMENTS AND SCHEDULES CONTAIN AN ACCURATE ITEMIZATION OF THE ASSETS AND LIABILITIES OF THE DEBTOR PRIOR TO FILING. CREDITORS ARE URGED TO SCRUTINIZE THE STATEMENT OF AFFAIRS AND SCHEDULES OF ASSETS AND LIABILITIES CLOSELY, AS WELL AS POST-PETITION OPERATION STATEMENTS, AND MAY INQUIRE WITH THE DEBTORS AND THEIR ATTORNEYS AS TO ANY PERTINENT FACTS REGARDING THESE MATTERS, SO THAT CREDITORS MAY BE ASSURED THAT FULL DISCLOSURE AND "ADEQUATE INFORMATION" ARE BEING FURNISHED WITH REGARD TO ASSETS AND LIABILITIES**.

## LIABILITIES

The liabilities of the Debtor are set forth in schedules D through F of the schedules filed herein, as well as in post-petition operating reports. Liabilities not listed as disputed are deemed allowed under § 11 U.S.C. §1111(a). None of the unsecured claims listed by Debtor are disputed. The claims register in this case indicates that unsecured claims in the amount of $35,092.01 have been filed as well as secured claims of $567,580.94. Were it not for the undersecured claimants, all

11

unsecured creditors would be paid in full under the Plan. Undersecured creditors, however, are entitled to a bifurcated claim under the Plan. For each undersecured claim, the Plan provides, in accordance with 11 U.S.C. 1111 (b)(1)(A), that such creditors shall have both a secured claim for the value of their claims as set forth in Article VI above, as well as an unsecured claim for the balance of the claim over and above the value of the collateral.

The Plan proposes to bifurcate certain secured claims as detailed in section VI into secured and unsecured amounts. Secured claims are to be paid through equal monthly payments over no longer than 30 years. Unsecured creditors are to be paid the lesser of 5% or $60,000.00 over no longer than 5 years under 11 U.S.C §1125(a)(15)(B), which references §1325(b)(2) of the Code.

**TO THE BEST OF DEBTOR'S KNOWLEDGE, INFORMATION AND  BELIEF THE LIABILITIES SET FORTH HEREIN AND ON SAID SCHEDULES CONSTITUTE A FULL AND COMPLETE ESTIMATION OF ALL LIABILITIES OF THE DEBTOR, AND THE AMOUNTS THEREOF (EXCLUDING INTEREST, ATTORNEY'S FEES AND ANY OTHER UNKNOWN OR VARIABLE FACTS, BEARING ON THE AMOUNT OF THE LIABILITIES). CREDITORS ARE URGED TO FULLY REVIEW WITH THEIR ATTORNEYS (AND CONSULT WITH THE DEBTOR AND THEIR ATTORNEY) THE SCHEDULES OF LIABILITIES FILED HEREIN, TOGETHER WITH THE MONTHLY OPERATION REPORTS FILED WITH THIS COURT**.

### VALUATION

The Debtor believes that the valuation of his assets shown on the schedules and by appraisal is a fair estimate, if the assets were sold at full market value. In the event, however, of the adjudication of the Debtor into a straight bankruptcy proceeding and the subsequent liquidation of his property

over a short period of time (and possibly at forced sale values), it is highly possible that a significantly lower value might be received for his property, especially in view of the present economic climate. The determination of the value may need to be determined by the Court in a separate evidentiary hearing on or prior to the date of conformation of the Plan.

The Debtor believes that he may achieve the greatest value for his property and recovery for creditors through a Plan of Reorganization which will be proposed by the Debtor herein.

### LIQUIDATION VALUE

In the event of any adjudication into a straight bankruptcy liquidation proceeding, the Debtor would suggest to creditors that they will be able to look for recovery from property sold by the Trustee only at a straight liquidation sale.  The assets of the Debtor under a Chapter 7 would be liquidated as follows:

/ / /

/ / /

/ / /

| Item | Current Value | Liens | Liquidation Value | Rent Produced |
|------|---------------|-------|-------------------|---------------|
| 2719 Boise Street, Las Vegas, Nevada 89121 | $88,000.00 | $236,800.00 | $00.00 | N/A Residence |
| 2451 Palora Avenue, Las | $83,500.00 | $195,400.00 | $00.00 | $1,100.00 |

13

| | | | |
|---|---|---|---|
| Vegas, Nevada 89121 | | | per month |
| 1937 Cindysue Street, Las Vegas, Nevada 89106 | $105,000.00 | $267,500.00 | $00.00 | $500.00 per month |
| 3505 Thomas Avenue, Las Vegas, Nevada 89030 | $97,000.00 | $161,600.00 | $00.00 | $500.00 per month |
| 2212 Sunrise Avenue, Las Vegas, Nevada 89101 | $128,000.00 | $265,400.00 | $00.00 | $1,600.00 per month |
| 200 Acres in Harney County, Oregon | $15,000.00 | $00.00 | $15,000.00 | $00.00 |
| 40 Acres in Apache, Arizona | $5,000.00 | $00.00 | $5,000.00 | $00.00 |
| 40 Acres in Elko, Nevada | $10,000.00 | $00.00 | $10,000.00 | $00.00 |
| 6162 N. Red Planet Lane, Pahrump, Nevada | $10,000.00 | $00.00 | $10,000.00 | $00.00 |
| Ciudad Real III Etapa, Polig. 42 Lote #25 Chile | $13,000.00 | $00.00 | $13,000.00 | $00.00 |
| Checking Account / Cash | $3,200.00 | $00.00 | $3,200.00 | N/A |
| Furnishings/clothing/ household goods | $2,500.00 | $00.00 | $*00.00 | N/A |
| Automobiles | $19,125.00 | $00.00 | $ *4,125.00 | N/A |
| Totals | $579,325.00 | $1,126,700.00 | $60,325.00 | $3,700.00 |

* Exempt items under Nevada law

The Debtor alleges and proposes that the value which he would receive for his property in liquidation would be substantially less than would be received through a plan of reorganization, yielding a diminished recovery, especially for general unsecured creditors, for the following reasons:

(1) Secured creditors must be paid in full first from the sale of the encumbered assets before unsecured creditors may receive any funds.  Therefore, in case of a forced bankruptcy liquidation, little recovery may be yielded for unsecured creditors, and in case of a forced liquidation through bankruptcy or otherwise, the equity of the Debtor's property will probably be eroded, thereby jeopardizing potential recoveries for junior lienholders as well.

(2) In connection with the above logic, administrative expenses would also be paid on a

priority basis and before the general, unsecured creditors would receive any funds. Administrative expenses in liquidation proceedings often amount to between 10% and 25% of the value of the property liquidated. In this case, a substantial amount of potential equity could be "eaten up" by administrative expenses and court costs incurred with the liquidation proceedings, which would probably exceed the administrative expenses in a reorganization proceeding.

(3) A forced sale of the property owned by Debtor, through a straight bankruptcy proceeding, rather than an orderly realization of value in a reorganization proceeding, may erode considerably the potential value of the Debtor's assets for junior lienholders and unsecured creditors. For example, a bankruptcy trustee in a straight liquidation bankruptcy proceeding would be forced to sell the property at public auction and the bankruptcy trustee would probably not be able to guarantee that the prices paid for the assets would be reasonable or appropriate to the value paid by the Debtor; rather, the prices paid might have to be in cash and at a reduced market value price indeed. In comparison, the Debtor is filing a plan of reorganization herein which will maintain the Debtor's business as a viable operation, thereby generating significantly more money and enabling all creditors to receive at least a portion of the money owed them. The liquidation value has been calculated at approximately $ 60,325.00.

The amount which would be paid to the secured creditors, if a liquidation would take place in this case would be at least $950,000.00. The liquidation figures above indicate a substantial decrease in value. Therefore, the proceeds of the liquidation to be applied toward the priority creditors, which would be paid first, and to the unsecured creditors would be zero. Upon an orderly sale of the property pursuant to this plan, 5% or $60,000.00 will be produced for these creditors.

## **FEASIBILITY**

The rents generated by the various properties are sufficient to cover necessary payments to all oversecured and undersecured creditors, so that they can be fully paid pursuant to the modified value of the various claims. Other rent money will be used for taxes, insurance, maintenance and repairs to the collateral, utilities, HOA dues, etc., all necessary expenses for the properties. The rents generated from each property appear to be sufficient to cover these expenses plus principal and interest payments pursuant to the valuations per appraisals. Additionally, such rents will cover bookkeeping and leasing services relating thereto. Debtor's intent would be that, subject to the Court's ruling on Use of Cash Collateral, any rents in excess of that necessary to service §506(a) claims of secured creditors along with any other disposable income pursuant to 11 U.S.C. §1325(b)(2) shall be paid to unsecured creditors, which are primarily the under-secured creditors, over the sixty-month period specified in 11 U.S.C. §1129(a)(15)(B).

## ADMINISTRATIVE CLAIMS AND PRIORITY DEBTS

## (UNCLASSIFIED CLAIMS)

In the event that the Debtor is adjudicated into a straight bankruptcy proceeding, and if his assets are sold, the trustee will be required to pay from the proceeds of the property the following expenses and/or debts in the following order:

(1)  First, all secured claims validly secured by any property sold would have to be paid from the sales proceeds.

(2)  Thereafter, administrative claims would have to be paid in full.

(3)  Thereafter, priority debts and especially taxes, wages and union benefits owing at filing would have to be paid in full.

(4)  Thereafter, unsecured claims would receive any residual equity from the proceeds of the

16

property sold or administered.  (It should be noted that junior lienholders and/or other creditors who are inadequately secured would be relegated to an unsecured status, if their security does not prove sufficient to pay their claims).

In a straight bankruptcy liquidation proceeding,  administrative costs would include court costs, debts incurred  during the pendency of the reorganization, and any professional  fees which may be paid to auctioneers, attorneys, accountants,  trustee (if any), and an examiner (if any).

In a reorganization proceeding, the creditors could expect that administrative expenses would principally be attorney's fees, which will probably exceed $25,000.00 in this case. Please review the following disclaimer.

**ADMINISTRATIVE EXPENSES AND CLAIMS CAN ONLY BE FIXED AND DETERMINED BY THE BANKRUPTCY JUDGE IN THIS CASE, AND THE DEBTOR WOULD RECOMMEND THAT EACH CREDITOR OBTAIN THE ADVICE OF HIS OR HER OWN INDIVIDUAL ATTORNEY TO THE PROBABILITY AND AMOUNT OF ANY ADMINISTRATIVE CLAIMS WHICH MAY BE PAID IN PREFERENCE TO CLAIMS OF GENERAL UNSECURED CREDITORS AND IN MAKING AN EVALUATION AS TO WHETHER A REORGANIZATION EFFORT WOULD BE PREFERABLE TO A LIQUIDATION OF THE ASSETS OF THE DEBTOR IN A STRAIGHT BANKRUPTCY PROCEEDING**.

The administrative claims will have significant bearing on the decision of each individual creditor in voting in favor of or against the plan of reorganization.  The  Debtor would suggest to creditors that administrative claims will be significantly less if a plan of reorganization is confirmed,  as opposed to a straight bankruptcy liquidation proceeding. Aside from attorney fees, the only other

administrative expenses in this case are the expenses of maintenance and repair of the various properties as well as taxes and insurance and HOA dues as necessary, all of which are current, along with U.S. Trustee fees which are also current. There are no other priority debts in this case aside from administrative expenses.

## VIII.

## SUMMARY OF THE PLAN OF REORGANIZATION

The Debtor's Plan, which was filed with this Court, proposes to divide the creditors into three classifications:  (a) Unclassified debts, (b) Oversecured Debts, (c) Undersecured Debts; and (d) Unsecured Debts.

a.    **Unclassified Debts**.  The Administrative Debts include attorney's fees in the amount of approximately $25,000.00; The quarterly payments to the Office of the United States Trustee, pursuant to 11 U.S.C. §1129 (a)(12) shall be paid in full on or by the effective date of the Plan.  The total cash needed by Debtor to secure confirmation of the Plan will be under $30,000.00. No priority debt exists except for the foregoing.

b.    **Oversecured Debts**.

These debts are unimpaired. See attached copy of Article IV of the Plan, Exhibit I. Debtor reserves the right to seek mediation or modification under state law.

c.    **Undersecured Debts.**

4.5 % interest paid over a  30 year period on valued claim.  See attached copy of Article IV of the Plan, Exhibit I.

      d.  **Unsecured Debts**.  the unsecured creditors, including bifurcated under secured claims, will receive <u>pro rata</u> payments of excess income available on a monthly basis, estimated be at 5% per cent on the dollar to all filed, settled and allowed claims, to a maximum of $60,000.00  Contingent or unliquidated claims will not be paid. Creditors should note that, in the case that an unsecured creditor objects to confirmation, Debtor must pay not less than their projected disposable income, to be received over the following five years, under 11 U.S.C. §1129(a)(15)(B). Unsecured creditors should be aware of the effect of this statute on the payment of their claims. In case of a <u>filed</u> objection by an unsecured creditor, Debtor must pay all their disposable income projected over the forthcoming five year period. This number may or may not exceed liquidation value. Should it exceed liquidation value, however, Debtor must pay the higher amount to creditors. Debtor has attached a five-year income projection as Exhibit J.

      Debtor would also note that all claims are considered to be impaired.

IX.

**RISK FACTORS**

      Based on the income history of the Debtor-in-possession over the last year, the risk of voting for the plan and receiving 5% repayment or $60,000.00, which is what the Debtor proposes to pay as a minimum to the unsecured creditors under this plan, is far preferable than the prospect of receiving funds from the liquidation of the Debtor under Chapter 7 of the Bankruptcy Code. There are, however, certain risk factors which must be noted. First, it is possible that the real estate market will continue to decline, in which case Debtor may have to decide that a modified Plan to sell the properties prior to further loss of value would be contemplated. Second, payments to the unsecured creditors in this individual case is dependent on the continued income of Debtor. Debtor knows of

19

no potential event which would cut off income during the 5 year disposable income period but, if that occurred, a modification of the Plan may be proposed.

## X.

### APPROVAL OF PLAN

In order to obtain confirmation of the plan by the Bankruptcy Court, the plan must be accepted by a majority of the creditors in each class who hold at least two-thirds of the titled claims in each respective class. Other requirements for confirmation are contained in 11 U.S.C § 1129(a) and (b) of the Code.

Under the Bankruptcy Code, as long as the plan is accepted by the holders of claims or interest in at least one class, the plan may be confirmed by the Bankruptcy Court "cramming down" the plan provision against the non-accepting classes of creditors.  The provisions for effecting a "cramming down" are very detailed and complex, and reference to the Bankruptcy Code is recommended in affecting it on dissenting creditors.  The Debtor has not decided whether he will utilize the "cramming down" provisions of the Bankruptcy Code to obtain confirmation of the Plan if the holders of claims or interests in any class do not accept the plan.  This determination will be made at a later date. Creditors should note that the absolute priority rule does not apply in the case of an individual Debtor under 1129(b)(2)(B)(ii).

### A.    Who May Vote or Object.

Any party in interest may object to the confirmation of the Plan if the party believes that the requirements for confirmation are not met.

Many parties in interest, however, are not entitled to vote to accept or reject the Plan. A creditor or equity interest holder has a right to vote for or against the Plan only if that creditor or

equity interest holder has a claim or equity interest that is both (1) allowed for voting purposes and (2) impaired.

In this case, the Plan Proponent believes that all classes are impaired and that holders of claims in each of these classes are therefore entitled to vote to accept or reject the Plan.

1.    **What is an Allowed Claim or an Allowed Equity Interest?**

Only a creditor or equity interest holder with an allowed claim or an allowed equity interest has the right to vote on the Plan. Generally, a claim or equity interest is allowed if either (1) the Debtor has scheduled the claim on the Debtor's Schedules, unless the claim has been scheduled as disputed, contingent, or unliquidated, or (2) the creditor has filed a proof of claim or equity interest, unless an objection has been filed to such proof of claim or equity interest. When a claim or equity interest in not allowed, the creditor or equity interest holder holding the claim or equity interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the claim or equity interest for voting purposes pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure.

The deadline for filing a proof of claim in this case is November 24, 2010.

2.    **What is an Impaired Claim or Impaired Equity Interest?**

As noted above, the holder or an allowed claim or equity interest has the right to vote only if it is in a class that is impaired under the Plan. As provided in §1124 of the Code, a class is considered impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class.

3.    **Who is NOT Entitled to Vote.**

The holders of the following five types of claims and equity interests and not entitled to vote:

- Holders of claims and equity interests that have been disallowed by an order of the Court;

- Holders of other claims or equity interests that are not "allowed claims" or "allowed equity interests" (as discussed above), unless they have been "allowed" for voting purposes;

- Holders of claims or equity interests in unimpaired classes;

- Holders of claims entitled to priority pursuant to §§ 507(a)(2), (a)(3) and (a)(8) of the Code; and

- Holders of claims or equity interests in classes that do not receive or retain any value under the Plan;

- Administrative expenses.

**Even If You Are Not Entitled to Vote on the Plan, You Have a Right to Object to the Confirmation of the Plan and to the Adequacy of the Disclosure Statement.**

      4.     **Who Can Vote in More That One Class.**

A Creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim, or who otherwise hold claims in multiple classes, is entitled to accept or reject the Plan in each capacity, and should cast one ballot for each claim.

      B.     **Votes Necessary to Confirm the Plan.**

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class of creditors has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cram down" on non-accepting classes, as discussed later is Section [B.2.].

      1.     **Votes Necessary to Confirm the Plan.**

22

A class of claims accepts the Plan if both of the following occur: (1) the holders of more than one-half (1/2) of the allowed claims in the class, who vote, cast their votes to accept the Plan, and (2) the holders of at least two-thirds (2/3) in dollar amount of the allowed claims in the class, who vote, cast their votes to accept the Plan.

A class of equity interests accepts the Plan if the holders of at least two-thirds (2/3) in amount of the allowed equity interests in the class, who vote, cast their voted to accept the Plan.

    2.      **Treatment of Nonaccepting Classes.**

Even if one or more impaired classes reject the Plan, the Court may nonetheless confirm the Plan if the nonaccepting classes are treated in the manner prescribed by §1129(b) of the Code. A plan that binds nonaccepting classes is commonly referred to as a "cram down" plan. The Code allows the Plan to bind nonaccepting classes of claims or equity interests if it meets all the requirements for consensual confirmation except the voting requirements of §1129(a)(8) of the Code, does not "discriminate unfairly," and is "fair and equitable" toward each impaired class that has not voted to accept the Plan.

**You should consult your own attorney if a "cramdown" confirmation will affect your claim or equity interest, as the variations on this general rule are numerous and complex.**

    C.      **Liquidation Analysis.**

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest holders would receive in a chapter 7 liquidation. A liquidation analysis is part of this Disclosure Statement on page 14.

**EFFECT OF CONFIRMATION OF PLAN**

23

### A.    Discharge of Debtor

Discharge. Confirmation of the Plan does not discharge any debt provided for in the Plan until the court grants a discharge on completion of all payments under the Plan, or as otherwise provided in §1141(d)(5) of the Code. Debtor will not be discharged from any debt excepted from discharge under §523 of the Code, except as provided in Rule 4007(c) of the Federal Rules of Bankruptcy Procedure.

### B.    Modification of Plan.

The Plan Proponent may modify the Plan at any time before confirmation of the Plan. However, the Court may require a new disclosure statement and/or revoting on the Plan.

Upon request of the Debtor, the United States trustee, or the holder of an allowed unsecured claim, the Plan may be modified at any time after confirmation of the Plan but before the completion of payments under the Plan, to (1) increase or reduce the amount of payments under the Plan on claims of a particular class, (2) extend or reduce the time period for such payments, or (3) alter the amount of distribution to a creditor whose claim is provided for by the Plan to the extent necessary to take account of any payment of the claim made other than under the Plan.

### C.    Final Decree

Once the estate has been fully administrated, as provided in Rule 3022 of the Federal Rules of Bankruptcy Procedure, the Plan Proponent, or such other party as the Court shall designate in the Plan Confirmation Order shall file a motion with the Court to obtain a final

decree to close the case. Alternatively, the Court may enter such a final decree on its own motion.

DATED this 12th day of November, 2010.

THOMAS E. CROWE PROFESSIONAL
LAW CORPORATION

By  /s/ THOMAS E. CROWE
    THOMAS E. CROWE, ESQ.
    2830 S. Jones Blvd. #3
    Las Vegas, Nevada 89146
    Attorney for Debtor-in-Possession

<u>VERIFICATION</u>

STATE OF NEVADA)
                        ss:
COUNTY OF CLARK)


HECTOR ECHAGUE , being first duly sworn, deposes and says:

That he is the Debtor above-named, and that he has read the above and foregoing Disclosure

Statement and knows the contents thereof, and that the same is true of his own knowledge except for

those matters therein stated on information and belief, and as for those matters he believes them to

be true.


                                         /s/HECTOR ECHAGUE
                                        HECTOR ECHAGUE

SUBSCRIBED and SWORN to before me

This 12th day of November, 2010.


/s/ PAMELA POULSEN
NOTARY PUBLIC in and for said
County and State.

                              ###

26